Good afternoon. Welcome to the Ninth Circuit. Thank you, Your Honor. Judge Nguyen, and I should have just come to New York. We could have done it there. Thank you for the hospitality. Somewhat unfortunately, this is the second trip to the Ninth Circuit on this case, as the Court is aware. My name is Thomas Doves. I'm from the Labaton firm. I would like to reserve four minutes for rebuttal. At issue on appeal are five statements that were made by British Petroleum. Of those five statements, the Court below found that four were false. I will not address those four unless they're questions. As to the fifth, depending upon the time I may address it, I will focus my attention on Scienter unless there are other questions. There are two threads that go through this that don't apply to every single aspect of it, but are generally true. Number one, the Court below did not test these allegations against a recklessness standard. She only tested them against an actual knowledge, actual falsity standard. We submit that was error and that some of these statements are, even if they are not actually false, they are, well, knowledge of falsity, they fall under a recklessness or deliberate recklessness standard, to use the language of the Ninth Circuit cases. Secondly, on a number of occasions, the Court does something that is also equally impermissible, which is under TELADS. You have to, by definition, under the methodology set forth, engage in a comparative analysis. Fair enough. But at the same time, one must take all the allegations that are well pleaded as true. So in creating the alternative scenario, the alternative arguably plausible scenario, one cannot either de facto deny the allegations as pled, and one is under an obligation to try to use the allegations, accept them as true, and from those true allegations, see if there's another competing alternative that is more plausible than the alternative that the plaintiffs have put forward. And without getting into all the jargon, it's simple to say that as to plausibility, a tie goes to the plaintiff. And that essentially sums it up. This case on the facts deals with one of the largest inland oil spills in history. It shut down the Prudhoe oil field. There were two leaks. One was started in the western operating area that was in March. A second leak was in the eastern operating area in August. What happened in that time frame and the knowledge in that time frame and the allegations with respect to what was going on in that time frame are vital. After the March spill, certain very, very dramatic things happened. On March 15th, the U.S. government, that usually does not have jurisdiction over these kinds of pipes, given their nature, decided to exercise jurisdiction, entered an ex parte order that had findings in it saying that BP had treated the eastern line and the western line similarly, they maintained them similarly, and moreover, they had to go through a process called pigging, particularly of the eastern line given what had happened on the western line. And what had happened on the western line is that 200,000 gallons of oil had spilled out and it covered two acres of land in a frozen lake in Alaska. So this was no small thing, even though the hole is usually described as the size of an almond. Now that order from the U.S. government also said, if you don't agree with us, we'll give you a hearing. But we have found irreparable harm, we've found an imminent danger to the environment and to life and property, and if we're wrong, ask for a hearing and show that we're wrong on our findings as to similarity, as to our findings on the need to pig, and our order to you that you must pig by a date certain, which had a formula that everyone agrees that it ended up being June 15th. So it was a broad sweeping, some might say arguably draconian order, and said we're not going to give you any extensions except for good cause shown. So the whole tenor and the provisions of that said the federal government is getting involved and we mean business. Then the politicians got involved and congressional hearings were called, the New York Times covered it, Time Magazine covered it, not just the trade press. So this was all over the media. Then we know that on August 6th there was yet another spill. Now there's several, let me go through the statements, I'm not going to spend the same amount of time on each one, some are easier to conceptualize than others. On March 15th there was two statements by Dr. Johnson. Dr. Johnson was the point person on the technical level for BP in Alaska. She has a Ph.D. in environmental engineering, and she said two things on March 15th. She said that the highly corrosive conditions were unique to the western line, namely the line that leaked. So they're unique to that line so everybody can calm down because it's not going to happen on the eastern line is the sense of that. Now what is the argument that that is plausibly false? Well, there are two arguments. First argument is, and the district court was right and wrong at the same time, the district court was right by saying some of the things we alleged happened after the statement. That's true, but it's also irrelevant. Because the relevant document that we rely on for this statement principally is the guilty plea that was entered in 2007. And the guilty plea admitted as a fact that in September 2005 they had insufficient inspection data on the western, excuse me, on the eastern line, on the line where there had been no spill. So for Mrs. Johnson or Dr. Johnson to say that it's unique, she doesn't know whether it's unique because they didn't have the inspection data. And they admit they didn't have the inspection data, and they're bound by that admission. And that admission speaks back to September 2005. So the fact that the plea agreement was entered into in 2007 is an interesting fact, but is irrelevant because they admitted as to what the state of facts were in 2005. So however one wants to phrase that, turning a blind eye to data, ignoring the fact there is no data, sweeping it under the rug, putting one's head in the sand, whatever classic definition one can come up with of recklessness, not having any inspection data and going out and telling the public and creating the impression that something is unique when you don't have a clue what's going on with the other line because you haven't pigged it and you have insufficient inspection results and you tell the government that is classic recklessness. Now there's a second point that also follows from that, and there's a factual dispute on that. The date of these statements is March 15th, which is the same day that the government issued its ex parte broad sweeping order. And there's a factual dispute as to whether she knew about it or not or whether she'd received it. It was addressed to her. That's not in dispute. So we would say it's more plausible than not that she either knew where the government was going to come out or had some idea since this was a big furor. There were government people all over Alaska trying to figure this out. But even if one wants to, which we submit you shouldn't on a motion to dismiss, give them that one, the guilty plea we submit is determinative with respect to recklessness as to that statement. There's another statement on March 15th which talks about the corrosion being low and manageable. Now the court below said, well, again, she didn't have access to the data. But the statement themselves refers to the data. What more do you need? Well, she referred to the data, and we allege she looked at it, she studied it, she understood it. And then you have the rather, let's call it a stretch finding, that maybe this Ph.D. didn't understand the drilling data she was looking at, even though she was the key person on these technical things for one of the world's largest oil companies in Alaska. So access has been admitted in the statement itself as to both of these March 15th statements. And we think the fact, the argument that she misunderstood it is totally implausible. And obviously we stand or we recommend that the court look at her analysis of why low, manageable corrosion is indeed false. The next statement chronologically is a statement by the chairman, Mr. Brown, or now Lord Brown, on April 25th. And that statement said a small hole caused it in spite of the fact that we have a world-class corrosion monitoring fact. Now that has been attacked on a number of grounds, and let me tick them off. But the chronology is important in terms of finding out whether our inferences are plausible or not, and what one balances them against. April 25th is roughly ten days after April 14th. And on April 14th, as alleged in paragraph 74, something very, very important happened, which is BP's internal review of this incident corroborated, in effect, the government was right, that you couldn't tell what was going on unless you pegged, and you couldn't make a diagnosis until you had pegged. And that was very bad news for BP, because it didn't want to peg, it didn't want to possibly shut down the wells, it didn't want to slow things down, all for very good commercial reasons, but it didn't want to peg. So now its own people are saying, ha-ha, the government is right on pegging, and they've ordered us to peg, and we now agree, reluctantly, we have to peg. That's on April 14th. After the statement on April 25th, on May 5, ten days later, the chairman goes to the board, and the board memo clearly states, parroting the findings of the internal report, that pegging is necessary. So you have, in this time frame, you have the very highest people in the company focusing on this, and we submit that it is recklessness for him to go out and make this statement without having looked at his internal report, without having looked at the government's report, and without having discussed it further. Because the government sure as heck didn't think this was a world-class corrosion monitoring system, and his own internal people, in effect, said the same thing by saying you can't find the answer without pegging, and we haven't pegged, and we've never pegged these lines, and that's the state of play. So to say it's world-class is to create an impression, if nothing else, under Brody, that's erroneous. World-class is not puffery. It's judgeable against objective reality. Look at the objective reality of what the U.S. government said and their findings, which were never contested in a hearing, and one of the interesting things about this case is the government came out with this very broad-sweeping order with really tough findings and said, okay, if we're wrong, you get a hearing. Never ask for a hearing. Just if I could interrupt you for a second. Certainly, Your Honor. Despite the reports and the government's view and so forth and so on, isn't pegging standard in the industry? Pegging is standard in the industry, and yes. I mean, the question is, did we allege that? Because I'm trying to stick close to the record. No, I understand. And I would say fairly, reading the complaint fairly, we would say it's standard in the industry and it should be done, and that standing alone is something that they certainly knew about, even at those high levels of an admittedly huge company. Not only standard, but if I understand your papers correctly, the only reliable way to assess the level of corrosion within the lines. When you are dealing with low-volume lines that have inclinations where they drop either below ground or even with the ground, they go this way, then they go back up, and the caribou pass over the place where it's dumped, and so you've built in a system where the bacteria can collect at the bottom. You have to pick, and you can put in additional oil corrosion inhibitors, but if the volume is low, the inhibitors only work if the sort of, for lack of a better term, the flushing mechanism with the draina in it does the job. If that's not high, which it wasn't in both these lines, then you have to pick, and that's why the government was so hard-nosed about it. Now, let's turn, so that's April 25th. On May 14th, Dr. Johnson comes back into the picture, and there's an analytical problem, which is that the district court mushed together Dr. Johnson's May 14th statements with her March 15th statements, and in fairness to everyone, things changed. We think the March 15th statements will stand on their own, and they are actionable, but by May 14th, things had even gotten worse or better, depending upon one's point of view, and Dr. Johnson says, we've looked. I mean, how can access to information be a question when the first words out of her mouth are, we've looked at all this data, and none of the transit lines have the same combination of factors, and then she lists three separate factors, one of which my colleagues say is the distinction that makes the difference, notwithstanding the overall impression is, don't worry, folks, we've really looked at this, and they're all, the western line is qualitatively different than the eastern line, so there's not going to be another leak, which is what the subliminal, if not overt message was. Well, again, May 14th is after the April 6th internal report that talks about you've got to pig, and we're still operating with the admission and the plea agreement that as of September, there had been no pigging, and there was an insufficient body of knowledge as to what was going on on the eastern line, and there's no evidence in the record that something was done on the eastern line, they certainly didn't pig, that we know, that something was done on the eastern line between March 15th and May 14th that would somehow water down or attenuate the intent requirement with respect to Dr. Johnson. So at the very least, Dr. Johnson was, we would submit, again, reckless, and that it's more plausible than a competing inference that she didn't have access to the data or something else, and indeed the district court's mushing together of the two statements really led her astray. I have a couple more, but you're down to three minutes. Do you want to reserve some time, or do you want to, time is yours. I'll do the annual report in one minute, or 30 seconds, and then I'll sit down and take the rebuttal. The annual report is dated June 30. There's a June 12 memo from Mr. Hayward. Mr. Hayward says he acknowledges the June 15 date. He calls it a target, but he acknowledges it. He wants to put it off. They're obviously lobbying a DOT to put it off. It didn't succeed. Whatever the hopes were of lobbying to put it off, it didn't work. So sometime after June 15th and before the statement was made on June 30th, he knew that statement was actually false, that they were in compliance with what the order of the Department of Transportation told them to do. So he knew it was actually false, or alternatively, it was deliberately reckless. And the idea, with all due respect to the district judge, that there's an affirmative defense under the securities laws, that it's okay to make a misrepresentation because you've sent it to the printer and you don't have to do anything about it is, let's put it, simply not the law and is an affirmative defense, which should not be ruled on in a motion to dismiss. Thank you. Thank you, counsel. Good afternoon, Your Honor. May it please the Court, Richard Pepperman on behalf of the defendants. Much of Mr. Doves' argument this afternoon struck me as in the nature of a jury argument. I think that this case represents a straightforward application of the PSLRA pleading standard to the allegations of the case. And what I would like to start with is four overarching points, and then I'll spend a little bit of time on the individual statements. The first point is the scienter standard. Mr. Doves misspeaks when he calls it a recklessness standard. Under Ninth Circuit law, it's a deliberate recklessness standard, and the word deliberate is significant. If you read Mr. Doves' brief, he argues that the various speakers here were deliberately reckless because they had reasonable grounds to question the accuracy of their statement. That's a negligence standard. Under Zucco Partners and Silicon Graphics, the law in this circuit is clear that deliberate recklessness is a form of intentional or knowing misconduct. The words deliberate recklessness mean something more than negligence, something more than even inexcusable negligence, and something more than mere recklessness. It is a degree of recklessness that strongly suggests an actual intent to deceive or defraud. The conduct must convince some intentional or conscious misconduct. The second thing that's important about this case is what the court can consider in assessing the pleadings. The court is not limited to the allegations of the complaint. Under the incorporation by reference doctrine, this court also can consider the documents on which the allegations are based so long as no one disputes the authenticity of those documents and they were provided to the court. That is highly significant, Your Honor, with respect to Ms. Johnson's March 15th statement about the September 2005 inspection data. The allegations in the complaint about that inspection data are based entirely on the April 14th, 2006 incident investigation report. The relevant paragraphs of the complaint, 60 through 64, cite that report. Under the incorporation by reference doctrine, this court can consider it. And what the plaintiffs have done in their complaint is they've pointed to a chart in that document. But if you look at the document at page ER 81, the chart concludes seven columns. In the complaint, however, they excerpt only one of the seven columns. And that column is what shows the maximum rate of corrosion for the areas that were tested. Now, the pipeline that leaked in March 2006 was a three-mile long pipeline. In September 2005, BP tested that three-mile long pipeline at 47 locations. As the incident investigation report makes clear, BP found that in the majority of the locations, the corrosion was very low. Indeed, in 40 of the 47 locations, there was no increase in corrosion activity at all. There was an increase in only seven of the locations. And the number that's cited in the complaint, the 30 MPYs, that was at only one of the 47 locations that were tested. But what was significant and is shown in that chart is that the wall thickness at that one location was three times BP's fit-for-service level. The fit-for-service level is one-tenth of an inch of thickness, and it was three-tenths of an inch of thickness. So what was concluded is that corrosion activity overall is low. It is high in one of the 47 areas that's tested, but the wall thickness is still three times our limit. So what we're going to do in response is instead of testing this annually, this pipeline annually, we're going to start testing it twice a year, and we're going to schedule a pig run for the summer. Now because Prudhoe Bay is above the Arctic Circle, most of the maintenance work is done in the summer months. So when you read the incident investigation report, it's clear that Maureen Johnson's statement on March 14, 2006, that the September 2005 inspection had showed an increase in corrosion, but at a low and manageable level, that that is entirely consistent with the discussion of the inspection data in the April 2006 incident investigation report on which the allegations are based. My third point, and I think again it's important for a securities fraud case, is the connection between the falsity prong and the scienter prong. Mr. Doves did not address this morning the falsity of the five statements that were issued. But what's important, Your Honor, is in his papers, what he argues is that the statements are plausibly false. When you say the statements are plausibly false, what that means is that they are subject to different interpretations. Under some of those interpretations, the statements are plausibly true. But if you have a situation where the statements at issue are only plausibly false. Well, let me have you address for a moment specifically Dr. Johnson's March 15, 2006, statement that corrosion appeared to be occurring at a low manageable corrosion rate. Now, that statement is false because it's contradicted by BP's own expert that the corrosion rate was high. Would you concede that? No, Your Honor. And, Your Honor, that's exactly what I was talking about before. She's referring to the September 2005 inspection data. And if you look at the incident investigation report that describes that data, it shows that in a three-mile long pipeline, 47 locations were tested. The majority of the locations showed very low corrosion activity. There was no increase at all in corrosion activity in 40 of the 47 locations. And in the one of 47 locations where the corrosion was MPY 30, which is higher. It was ten times higher. Well, Your Honor, one of the things that's interesting is if you look at the chart, is that back in, I believe it was 2004, but it could have been 2003, the highest corrosion level was 22 MPY. And then it went from 22 MPY to zero the next year. And then it went up to four the year after that. And then it went up to 30. But the important thing in assessing the statement is that that was only one of the 47 locations tested. And for that location, for that location, the wall thickness was three-tenths of an inch. All right. I understand your argument now in response to that. Let me, because time is short, go to the same statement, but talk about Sienter. And if I can refer you to the district court's finding with regard to Sienter, in particular as to that statement, the district court indicated that the inference that plaintiffs, that Johnson essentially intended to mislead the investors, is not as strong as the opposing inferences that Johnson misunderstood BP's data or that she did not have access to the data. So if you can talk about her role. I mean, this is an engineer, as I understand it, who has a Ph.D. So it's hard for me to understand why the opposing inference that Johnson misunderstood the data. Isn't it her job to review the data and understand it? Wasn't she the person in charge of the operations here? Your Honor, and that was exactly the point I was getting to. That's an excellent question. And what it links into with is the connection between the falsity of the statement and Sienter. If you look at her statement and you go back and you look at the inspection data, as I've been doing, her statement is not inconsistent with the data. Now, if the Court were to conclude, if the Court were to conclude that, well, based on what happened later, as we all know with hindsight, the problem was much worse than was expected in March of 2006. If the Court were to conclude that that statement is plausibly false, the inference, you still need to show a strong inference of Sienter. And when her statement is really consistent with the data as set out in the April 2006 incident investigation report, and there are no documents that show that she received that contradicted her statement. I mean, there are no documents that she cited that she's – that the plaintiffs cite as showing that she received information before March 15th that contradicted her statement. So assuming, though, that we reject that argument and find that there was sufficient allegations of falsity, would it be reasonable then to conclude that the opposing inference, that she misunderstood the data, is as compelling as the opposing inference? Your Honor, I'm not arguing here today that she misunderstood the data. I'm not – I did not argue that below. I think what Judge Peckman did in working through this is that the inference of Sienter here is very weak. And under Tel Avs, she was thinking, what are the competing nonculpable inferences? And she threw out inferences that she didn't receive the data, she didn't understand the data. What my point is, Your Honor, is that her statement, if you look at – if you look at ER 81, ER 82, that describes the September 2005 inspection data, her statement is consistent with that. And given that her statement is consistent with the data, the only way you can plead a strong inference of Sienter, that kind of intent to deceive or defraud, intentional misconduct, is to show that before she made the statement, she received a document or some information that contradicted her statement so that she either knew it was false or she acted with this high degree of deliberate recklessness. Well, that she received the data or readily had access to the data, which I'm assuming by virtue of position that she would have access to it. I think she would have had access to it. I will say, however, Your Honor, as a pleading matter, is when someone – it is often the case that heads of business units give reports based on reports that are provided to them by others. It's not always the case that the head of a business unit goes through and reads the underlying data. But the important thing is we don't have to speculate about what the data is. The summary of the data is in the record at 81 through 82. The court can consider it under the incorporation by reference doctrine. And the data is entirely consistent with her statement. So my Sienter argument, Your Honor, is first, I don't believe the statement was false. If it's plausibly false, it's also plausibly true. There are other interpretations such that that makes it even harder under the PSLRA to plead the strong inference of Sienter. And there is no document – and this is not your typical case. This case has been around for nearly seven years. The plaintiffs here have had access to all of the documents that have been produced in all of the government and private litigation related to the Prudhoe Bay oil spill. So there's a massive evidentiary record that preceded the filing of the fourth complaint in this action. And there is no allegation that she received information that contradicted her statement. The only allegation is that her statement was inconsistent with the data. But that's not true. Let me have you go to the next two statements by Dr. Johnson about the uniqueness of the conditions. Now, what do you make of the fact that the western lines and the eastern lines are very similar in terms of how that fact plays into either falsely or Sienter? Well, the pipelines are similar. The question has always been whether the corrosive conditions that cause the leak in the pipeline in the western operating area were unique to that pipeline. The statement you're referring to, Your Honor, is a March 15, 2006 statement. One of the things that I think is interesting is this is from an Associated Press article. It's not a quotation of Ms. Johnson. There are no quotation marks. It's simply a sentence in the article that said, Johnson said it appears the highly corrosive conditions were unique to that line. Now, this was a statement reported in the press a mere 13 days after the initial leak, reporting what Ms. Johnson believed at the time, that this leak, which was wholly unexpected, was caused by corrosive conditions that were unique to that line. There are no allegations in the complaint that she received any information prior to the March 15 statement that contradicted her statement, that shows that she was engaging in some conscious or intentional misconduct. And the important thing, Judge Winn, is her statement was not that the pipelines themselves are dissimilar. Her statement made 13 days after leak was, it appears that the highly corrosive conditions were unique to that line. And that is an accurate statement of what the belief was less than two weeks after the initial spill. I mean, a statement obviously, as further inspections were done, was shown to be incorrect. But I assume the other line still has the risk factors involved, which are the low placement of the pipe or the caribou crossing where settling can occur, right? Well, Your Honor, yes. So why would it be unique to the one line as opposed to the other? And this is why I think, again, Your Honor, this is all set out in the incident investigation report on which the pleadings are based. And you have to sort of take a step back, is there had never been a corrosion problem with respect to the oil transit lines? I mean, Judge Deary asked the excellent question, you know, isn't it standard practice to pig pipelines? And the answer is yes. And the water bearing pipelines at Prudhoe Bay were pigged once a week or once a month. The oil transit lines were historically viewed as low risk with respect to corrosion, which is why they were primarily tested through ultrasonic thickness testing and corrosion coupons. When the spill happened in March, and the incident investigation report sets this out, there was a huge spike in corrosion between September and March. In September, only one location tested 30 MPY. By March, every location was 40 to 70 MPY. So something dramatic had happened between September and March. The inference was, at that time, was there's something unique to this pipeline. And so the investigation. What was unique? There are two things that were unique, and it goes into Ms. Johnson's combination of factors statements on May 14th. Gathering Station 2, which was the starting point of this OTL-21, the one that leaked, had started viscous oil production, meaning that the oil flowing through that pipeline had much greater solids in it. Viscous is a thick, solid oil flow. The theory was that these solids soaked up the corrosion inhibitor, and that therefore there was low corrosion inhibitor carryover, and that the low corrosion inhibitor carryover caused an increase in bacterial activity. So the theory, as set forth in the incident investigation report, and actually as explained in the entirety of the May 14th Petroleum News article, was that you had viscous oil flowing through this pipeline. It included lots of solids. The solids soaked up the corrosion inhibitor, and that resulted in an increase in bacterial activity. So from the view, as of the spring of 2006, was that it was kind of a perfect storm. There was lower flow rate, and that's across all of Prudhoe Bay, because production at Prudhoe Bay has declined 50% since 1987. There's just less oil in the ground. There was low corrosion inhibitor carryover on this one pipeline because of the viscous oil production. This was, at the time, a hypothesis. She stated it as a matter of fact. Your Honor, I don't think so. I think what she said, and it's very hard because the statement that's quoted in the Petroleum News has ellipses in it, so we don't know what language was omitted from the statement. But what she said is we looked at all the other oil transit lines, and none other has the same combination of factors. The bacteria in the facility, which was elevated because of the low corrosion inhibitor carryover, the low flow rate, and I'll agree that applied throughout Prudhoe Bay, and then the third one, the low corrosion inhibitor carryover. But the key thing, Your Honor, is that her statement was consistent with all the contemporaneous documents at the time. And based on that, you cannot infer that she acted with a, you cannot give to a strong inference that she was engaged in intentional misconduct. And, you know, the thing that's key in how this case has evolved is when this case was brought, Judge Deary, it was along the lines of your hypothesis, which was that BP hadn't disclosed to the market that its maintenance system was inadequate. And it was based entirely on the failure to pig these lines over a long period of time. The western operating area line had not been pigged since 98, and the eastern operating area had not been pigged since BP took it over from ARCO. The reason that's why that's not the case before is it's clear that that fact, the failure to pig, was out in the marketplace immediately after the first leak. Immediately after the first leak, there were press articles stating exactly that, that BP hadn't pigged these lines since 1998. Now, if I could just, Your Honor, my time is running out, make two quick points. One is on the statement about the world-class corrosion monitoring system. There were two parts of John Brown's statement. One, his full statement was that it was a world-class corrosion monitoring system being applied consistent with Alaska regulations. There's no claim here today that the system was not being applied consistent with Alaska regulations. The only claim was the statement that it's world-class, which is exactly the kind of corporate puffery the courts have held are not material and reasonable investors. What an investor will look at is the statement that it was being applied in The last thing I want to do is just talk. But if it's standard in the industry that the only accurate way of assessing the level of corrosion is pigging, I don't understand whether Alaska regulations are required or not. I don't understand this sort of unqualified statements that are being made. Well, Your Honor, even if you accept that, the statement. Well, do you accept it? No, Your Honor, I don't. I don't. Because I think for purposes of. . . It's a little shocking they haven't pegged it since 1998. Well, Your Honor, what the test was is they did. . . That has nothing to do with this case. Let's just say this. BP entered into a guilty plea, which was predicated on the idea that its maintenance of the pipelines were negligent. So I'm not here defending the maintenance practices. I'm here saying that this case is really a case about corporate mismanagement. It's not a case about securities fraud. It's not a case where people made intentionally false statements or deliberately reckless statements with an eye towards defrauding the market. And just to show you why that wouldn't make sense, and I'll conclude on this, as Mr. Doves pointed out, BP was ordered on March 15th, the day of the first statement, to pig all of the oil transit lines in Prudhoe Bay, western operating area, eastern operating area, and was ordered to do so by June 15th and report the results of that testing to the Department of Transportation. So as of March 15th, BP knew that it was going to have to smart pig all these lines and give the government the results. So the true condition of the pipelines were going to be known to the government and to the world at large. Why then would you engage in a scheme to defraud the market in the short period between March 15th and June 15th, as to the conditions of the other pipelines, when you knew that you were under a government order to smart pig them and release the results of that test? When you do the holistic analysis of Scienter, the whole theory of fraud here doesn't make sense. There's no claim that Ms. Johnson was unloading her BP stock in between the time that she made the statements and when the pipelines were pigged. And indeed, just showing how the market had already calculated into it that BP hadn't smart pigged these lines in 10 years, and that the maintenance was inadequate, is when the second spill was discovered, and all of Prudhoe Bay was shut down for, I think it was, 12 days, you know, that the stock drop was 2.8%. That's the stock drop that's being sued on here. So the market had already internalized from day one, based on the government action, based on the press reports, that BP's maintenance of these pipelines was far from ideal. The theory that there was some fraud going in here to convince the market otherwise, when BP admitted it hadn't pigged the lines in 10 years, admitted it needed to pig the lines, and admitted it was going into an ongoing investigation. Thank you, counsel. Thank you, Your Honor. We'll equalize the time roughly. I'm going to put four minutes on. Thank you, Your Honor. My colleague essentially wants to conflate falsity and scienter, and then say this conflated entity is subject to the Telabs comparative analysis. That premise is false. As to falsity, if we plead something that is plausible, the comparative analysis methodology doesn't apply. Now, what you essentially heard was a summary judgment argument, and maybe he will prevail on that someday. And if he wants to argue to Judge Peckman the pure heart and the empty head, that's fine, and there will be a day for that. But today is not the day. Our allegations should be taken as true, and our allegations, he's just in effect denying them and saying he doesn't like them, and really you interpret the data differently. And Dr. Johnson did not say, which what she should have said was, you know, we don't have much information in September 2005. We have no information about one of these lines that may be crucial, and indeed is virtually the same, if not similar. And our very tentative results or views are X, Y, and Z. That would have been a responsible thing to say. But, no, they didn't want the stock to go down. They weren't sure at that point, even if you buy his truth on the market theory, which I'll get to in a second, you know, it had not factored in all this. They were doing damage control, and she was saying what she had to say to minimize it and to put as much daylight as possible between a BP's position and what we have alleged she knew the government was going to say, which was the government was coming down on them very hard, saying, these are similar, you haven't pigged, you've got to pig, you've got to pig now. And the record is complete with the fact that they wanted to delay pigging, they didn't want to pig, they thought they could lobby the DOT to do it, and so they're not the brilliant, great corporate citizens who are running around just being negligent. They didn't want to pig, they didn't want to observe industry standards, and at the same time they were making all these statements. But your colleague's point is whether they wanted to pig or not, they were going to have to pig, and the results of that testing, of smart pigging was going to be known to the world. So where is the motivation to purposefully mislead in the wake of the first bill? Well, first of all, as Your Honor knows, motive qua motive is not an element of the cause of action. One can have a very benign, pure motive, and one can falsely represent information. One can have a very pure, benign motive, and not dig deep enough, or close one's eyes to the obvious, or make statements that make it look like to the world that you have inspection data that you've looked at, and as a Ph.D. you've reviewed before you're making these statements, and that didn't happen. So motive is part of the holistic analysis at some point, I grant you that. But the fact that the stock only dropped 2.8 percent, let me tell you, in a multi-billion dollar cap stock, it's like one of these tech companies going down 25 or 30 percent. Now that's assuming that that is relevant to the holistic analysis, which I would submit it's not, because it's just a disguised affirmative defense of truth on the market, which is for another day. So as part of this holistic analysis, one has to look at the guilty plea, which he didn't touch. One has to look at the government findings on all this. You have to look at the access to the data, which they admit in their statements more often than not, or the chronology is so tight that it would be irrational to think that they didn't know what was going on, even at the highest levels of this company, which is conceitedly very, very big. And so we submit, and if I called it recklessness, the jargon varies from circuit to circuit. We all know what we're talking about. It's deliberate recklessness under the securities laws. There's some element of cognition. It's greater than gross negligence. There's no debate about that. And for those reasons, unless there are any further questions, we would urge that the court go through the statements, look at them on a reckless standard, and then at the end, as the court did in the New Mexico case, look at them holistically, and I think looked at holistically, this is not a very pretty picture. Thank you, counsel. Thank you both for your arguments. Thank you for coming out to the Ninth Circuit. It's an important case, and we appreciate your attention and excellent presentations. We'll be in recess.
judges: Dearie, Thomas, Nguyen